# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

––––––

Argued October 5, 2012          Decided December 14, 2012

No. 11-5180

KHAIRULLA KHAIRKHWA, DETAINEE, GUANTANAMO BAY
NAVAL STATION, AND SAMI AL HAJJ, AS NEXT FRIEND OF
KHAIRULLA KHAIRKHWA,
APPELLANTS

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

––––––

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01805)

––––––

*J. Griffin Morgan* argued the cause for appellant. With him
on the briefs were *Robert M. Elliot* and *C. Frank Goldsmith*, *Jr.*

*Dana Kaersvang*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With her on the brief were *Tony
West*, Assistant Attorney General, *Ian Heath Gershengorn*,
Deputy Assistant Attorney General, and *Robert M. Loeb*,
Attorney. *Lowell V. Sturgill Jr.*, Attorney, entered an
appearance.

Before: ROGERS and GARLAND, *Circuit Judges*, and
RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: This is an appeal from the judgment of the district court, Urbina, J., denying Khairulla Khairkhwa's petition for a writ of habeas corpus.

Khairkhwa is a detainee at Guantanamo Bay Naval Base. *Khairkhwa v. Obama*, 793 F. Supp. 2d 1 (D.D.C. 2011). The Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorized the President to detain individuals who were "part of" al-Qaeda, the Taliban, or associated forces engaged in hostilities against the United States or its allies. *See, e.g.*, *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010); *Awad v. Obama*, 608 F.3d 1, 11–12 (D.C. Cir. 2010). The National Defense Authorization Act for Fiscal Year 2012 affirmed the President's authority to detain any "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces." Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011).

Khairkhwa, an Afghan national, became a senior Taliban official in 1994, several years after Soviet troops withdrew from Afghanistan. He admits as much but asserts that he was not a part of the Taliban forces.[1] The evidence presented at a four-day hearing before the district court showed otherwise.

---

[1] Although the district court discussed classified evidence, the unclassified evidence set forth in this opinion is alone sufficient to sustain the court's denial of Khairkhwa's petition.

Khairkhwa was a Taliban spokesman and senior district administrator for several years, became governor of Kabul for a brief period, and then served as the Taliban's acting interior minister from approximately 1996 to 1999. *Khairkhwa*, 793 F. Supp. 2d at 16. He was one of ten members of the Taliban's highest leadership council, the Supreme Shura, which reported directly to Taliban leader Mullah Omar and supervised subordinate councils responsible for military operations. *Id.* at 32. Most of the members of senior Taliban shuras were also military commanders. *Id.* at 33. Khairkhwa was no exception: the district court found that he was a commander in the 1997 and 1998 Taliban assaults on the western Afghan city of Mazar-e-Sharif.[2] *Id.* at 21–32.

Mullah Omar appointed Khairkhwa governor of Herat province in October 1999. He was still serving in that position when the United States invaded Afghanistan in the fall of 2001. *Id.* at 16–17, 33. As governor of Herat, Khairkhwa distributed funds to Taliban military and security forces. *Id.* at 35. He had extensive knowledge of Taliban military facilities, personnel, and weapons caches and capabilities. *Id.* at 33–35. After he was captured, Khairkhwa provided detailed information of the Taliban's assessments of shoulder-fired anti-aircraft missiles and of the Taliban's efforts to obtain and protect Stinger missiles. *Id.* at 34–35. He also described each military facility in Herat province, including its location, condition, special characteristics or capabilities, and other sensitive information. *Id.* at 33–34.

---

[2] These were major battles fought during the Taliban's violent rise to power. *Khairkhwa*, 793 F. Supp. 2d at 21–22. Taliban forces massacred thousands of the Hazara residents of Mazar-e-Sharif after seizing the city in 1998. *Id.*

The evidence showed, and the district court found, that officials in Khairkhwa's position possessed military authority under the Taliban governance structure. *Id.* at 33. "[N]early all senior Taliban leaders held both civilian and military positions"; Khairkhwa's predecessor, Mullah Abdul Razaq, was a senior military commander while he was governor of Herat. *Id.* The obvious inference to be drawn from all of this evidence, an inference the district court correctly drew, is that it was more than likely that Khairkhwa wielded authority over military matters during his tenure as governor of Herat.

Khairkhwa admits that he met with senior Iranian officials several times while serving as Herat's governor. He does not deny that at one such meeting in January 2000, the participants discussed how to protect Afghanistan from United States intervention. Relying in part on these admissions, the district court found that Khairkhwa participated in another high-level meeting with Iranian officials in early October 2001. *Id.* at 37–38. The Iranian delegation included the deputy commander of the Iranian Foreign Intelligence Service and the head of the Afghan Department of the Iranian Foreign Intelligence Service. *Id.* at 37. In anticipation of the U.S.-led military operation, the Iranian officials offered military support for the Taliban's defense, including anti-aircraft missiles, other unspecified equipment, and free passage for "Arabs" traveling between Iran and Afghanistan. *Id.* at 37–38. The Taliban delegation also included Abdul Manan Niazi, the governor of Kabul and commander of the Taliban forces who committed atrocities at Mazar-e-Sharif in August 1998. *Id.* at 37.

The district court thought it significant that Khairkhwa was appointed to represent the Taliban in these high-level military meetings. To the court, the evidence showed that Khairkhwa "was entrusted with significant military-related responsibilities at the time of the outbreak of hostilities with the United States

and strongly indicates that he was part of Taliban forces at that time." *Id.* at 40. The court properly rejected Khairkhwa's assertion that he was merely a security officer protecting the Taliban delegation. Even if the evidence supported Khairkhwa's version, which it does not, this would still "demonstrate that he possessed command authority over Taliban forces on the eve of the U.S.-led invasion," *id.* at 39.

The district court also found that Khairkhwa continued to operate within the formal Taliban command structure after Operation Enduring Freedom began in early October 2001, and provided support to Taliban military forces. *Id.* at 40. Khairkhwa admitted, during a 2002 interrogation, that in early November 2001 he traveled from Herat to the Taliban-controlled Kandahar province in a convoy of vehicles full of weapons and that he turned over the weapons to a local official. *Id.* at 40–41.

Khairkhwa was arrested in Chaman, Pakistan, at the home of Abdul Manan Niazi, the same former Taliban governor who commanded Taliban forces at Mazar-e-Sharif, and who joined Khairkhwa in the October 2001 meeting with Iranian intelligence officials. *Id.* at 44–45. The circumstances of Khairkhwa's capture, his close ties with Mullah Omar, and the absence of anything showing that he dissociated himself from the Taliban demonstrated that Khairkhwa remained part of the Taliban forces at the time of his capture. *Id.* at 43–45.

Khairkhwa thinks the government had to prove more. By his lights, the government also had to show that he "fought or engaged in armed conflict or hostilities against the United States or its allies" and that if he were released, he would pose a danger to the United States in the future. Pet'r's Br. 9. The decisions of this court are to the contrary.

In order to detain individuals who were part of the Taliban or al-Qaeda forces, proof that the individuals also actively engaged in combat against the United States and its allies is unnecessary. *Al-Bihani* so decided, 590 F.3d at 872–74, as have many of our other decisions. *See, e.g.*, *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011); *Al-Adahi v. Obama*, 613 F.3d 1102, 1103 (D.C. Cir. 2010); *Al Odah v. United States*, 611 F.3d 8, 10 (D.C. Cir. 2010); *Barhoumi v. Obama*, 609 F.3d 416, 423, 427 (D.C. Cir. 2010); *Awad*, 608 F.3d at 11–12. Khairkhwa calls the standard set forth in *Al-Bihani* "dictum" because the detainee in that case actually "participated in hostilities." Pet'r's Reply Br. 4. If by this he means the detainee fired a shot or detonated an explosive, the distinction is unsupportable on the evidence. Al-Bihani did not engage in combat in those terms—he was a cook for forces associated with the Taliban; he carried a firearm but never used it in "hostilities." *See* 590 F.3d at 869. Like Khairkhwa, Al-Bihani contended that he could be detained only if he had committed "a direct hostile act, such as firing a weapon in combat," *id.* at 871. In rejecting that contention, the court ruled that Al-Bihani's role as part of forces associated with the Taliban was enough to justify his detention. *Id.* at 872–73. All of our decisions citing the *Al-Bihani* standard are consistent with this reading of the opinion.

Khairkhwa's argument is in any event untenable. In modern warfare, commanding officers rarely engage in hand-to-hand combat; supporting troops behind the front lines do not confront enemy combatants face to face; supply-line forces, critical to military operations, may never encounter their opposition.

As to Khairkhwa's other point—that a person may not be detained unless the evidence also shows that he would pose a danger to the United States if released—*Awad* squarely rejected the argument. 608 F.3d at 11. Khairkhwa recognizes this, but

insists that *Awad* was wrongly decided. Pet'r's Reply Br. 6. What he fails to recognize is that one three-judge panel of this court may not overrule another three-judge panel. *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

We find no clear error in the district court's factual determinations. *Awad*, 608 F.3d at 6–7. The evidence recited above establishes that Khairulla Khairkhwa was at least more likely than not a part of the Taliban forces.[3] *See id.* at 10–12; *see also Al-Adahi*, 613 F.3d at 1103–05; *Al-Bihani*, 590 F.3d at 872. Accordingly, the district court's denial of Khairkhwa's petition for a writ of habeas corpus is

*Affirmed.*

---

[3] We have considered and rejected Khairkhwa's other contentions.